WILLIAMS, J.
11 Plaintiff, Melanie Christy, sued the Caddo Parish School Board (“CPSB”) and Dr. Sandra MeCalla, the principal of Captain Shreve High School, for personal injuries arising out of an incident involving plaintiffs son, Justin Christy. Following a bench trial, the trial court found the CPSB hable and awarded $50,000 in damages. For the following reasons, we affirm.
FACTS
On October 6, 2003, Justin Christy (“Justin”) was a 17-year-old senior at Captain Shreve High School (“Captain Shreve”). During his first-period class, Justin opened his backpack and a bottle of “Kentucky Deluxe” whiskey rolled onto the floor and broke. Justin was sent to the office, where he was questioned by Marvin Hite, the assistant principal of administration and discipline. Justin informed Hite that he did not know that the alcohol was in his backpack and did not know how it had gotten there. Hite’s attempts to contact Justin’s parents were unsuccessful. Hite summoned Corporal Gregory Jackson, an officer with the Shreveport Police Department, who was assigned to the school as a resource officer. After questioning Justin, Cpl. Jackson placed him under arrest and transported him to the police station.[1] Cpl. Jackson charged Justin with a violation of a city ordinance by being a “minor in possession of alcohol.” He gave Justin a summons to appear in city court, transported him back to the school and instructed him to go home and “get in touch with [his] parents.”
| ^Approximately one hour after Justin was sent to the office, Andrew Heacock, the president of the student council at Captain Shreve, learned about the incident. Heacock voluntarily approached Hite and admitted that he had placed the bottle of whiskey in Justin’s backpack. Heacock also stated that Justin was unaware that the bottle was in his backpack. Hite instituted disciplinary action against Justin. No disciplinary action was instituted against Heacock.
Justin was initially suspended from school for three days. Thereafter, Dr. MeCalla recommended that Justin be expelled from Captain Shreve. At some time during the investigation, Hite notified Dr. MeCalla that Heacock had informed him that he (Heacock) had placed the bottle of whiskey on the seat of Justin’s truck, rather than inside the backpack. However, Heacock emphatically testified that he never told Hite that he had placed the bottle on the seat of the truck. Heacock also testified that Dr. MeCalla called him into her office prior to the expulsion hearing and questioned him. He stated that he reiterated to Dr. MeCalla that he had placed the bottle of whiskey inside Justin’s backpack.
*692 An expulsion hearing was scheduled. Prior to the hearing, Heacock approached Hite and informed him that he wanted to testify at the hearing on Justin’s behalf. Hite told Heacock that his testimony would not be needed. Therefore, at Justin’s request, Heacock prepared a written statement, which reads as follows:
To whom it may concern:
On the morning of Sunday, October 5, I discovered a bottle of whiskey i[n] the back of my car. Not knowing [ 3whose it was or how it had gotten there, I took it out of my car and put it in Justin Christy’s backpack, which was on the front seat of his truck. I believed that he would throw it away in the dumpster by his house. Justin spent the night with me the night of Saturday, October 4 and was still at my house asleep when I put the alcohol in his backpack. I had intended to tell him that the whiskey was in his bag before he left my house, but I went back to sleep and he left without waking me up. I didn’t call Justin and tell him that I had put the whiskey in his bag that day because I believed that he would have discovered it by then. I never told Justin that I had put the alcohol in his backpack until noon on Monday, October 6 after he had been suspended.
The statement was signed by Heacock and his father.
The expulsion hearing was held on October 10, 2003 in Hite’s office at Captain Shreve. Larry Anderson, the supervisor of child welfare and attendance for the CPSB, was in charge of the hearing. Plaintiffs requested that Heacock be allowed to testify, but the school officials denied the request, stating that they “already had a statement” from Heacock. Justin testified that after Hite presented the school’s version of the incident, he was allowed to give his “side of the story.” Justin further stated, “There was no really [sic] discussion. [Anderson] just decided-it was already decided before I came in there.”[2] At the conclusion of the hearing, Anderson upheld Dr. McCalla’s recommendation that Justin be expelled from Captain Shreve. Anderson determined that Justin would be placed at Hamilton Terrace Learning Center, an alternative school, for a period of five months, from October 13, 2003 through March 12, 2004. Following the hearing, Justin was instructed to clear his belongings from his locker and was escorted out 14of the school.
Justin and his parents appealed Anderson’s decision to the preliminary appeals committee of the CPSB. Like Anderson, the committee allowed Hite to present the school’s version of the facts, then allowed Justin to present his version. The committee upheld the expulsion, but modified the term of the expulsion from five months to two months.[3] On November 12, 2003, Ollie Tyler, the CPSB’s superintendent, issued a memorandum ratifying the committee’s recommendation *693 that Justin’s expulsion to the alternative school be modified from March 12, 2004, to December 19, 2003. Tyler also recommended that Justin be “permitted to enroll at Southwood High School on January 6, 2004 to complete the two Carnegie units needed for graduation.”
Justin’s mother, the initial plaintiff herein, appealed the committee’s decision to the CPSB, which upheld the recommendation of the superintendent. Plaintiff did not appeal the CPSB’s decision to the district court.[4]
IfiOn February 10, 2004, Justin’s mother, Melanie Christy, filed a lawsuit, individually and on behalf of Justin, alleging that the CPSB violated Justin’s right to due process and imposed an “excessive and irrational punishment.” Plaintiff also alleged that the actions of the CPSB and its employees “were unreasonable, illogical, unjustifiable in light of the evidence, arbitrary, capricious, without just or lawful cause, and malicious.” Plaintiff further alleged that the CPSB’s actions caused “extreme mental anguish and distress, grief, humiliation and inconvenience!.]”[5]
On March 15, 2004, defendants filed a peremptory exception of no cause of action. Defendants unsuccessfully argued that plaintiffs claims were unsupportable because Dr. McCalla and the CPSB acted “in accordance with statutory law,” which allows the expulsion of a student who possesses alcohol on school grounds.
Following a bench trial, the trial court ruled in favor of plaintiff and awarded damages in the amount of $50,000. Specifically, the court found that Hite failed to provide the hearing officer and the preliminary appeals committee with the full truth and that his actions were “intentional.” The court also found that Anderson’s actions were “grossly negligent.” The CPSB appeals.
IfiDISCUSSION
The CPSB contends the trial court erred in finding it liable to plaintiff. The CPSB argues that the actions of its employees were appropriate and permissible under LSA-R.S. 17:416(A) and (B).
A school principal may suspend from school any pupil who possesses alcoholic beverages, in any form, in school buildings, on school grounds, or on school buses owned by, contracted to, or jointly owned by any city or parish school board. LSA-R.S. 17:416(A)(3)(a)(vi). LSA-R.S. 17:416(B)(l)(a) provides:
Any student after being suspended for committing any of the offenses enumerated in this Section may be expelled, upon recommendation by the principal of the public school in which said student is enrolled, which recommended expulsion shall be subject to the provisions of Subsection C.[6]
*694 Plaintiff does not dispute that the CPSB had the discretion to suspend or expel Justin for possession of alcohol on a school campus. However, plaintiff argues that the CPSB officials refused to exercise any discretion in |7their treatment of Justin. Plaintiff additionally argues that the school board violated Justin’s right to due process when Hite concealed and/or mischaracter-ized the evidence during this entire process. According to plaintiff, the trial court was correct in concluding that Hite’s actions were intentional and Anderson’s actions were grossly negligent.
In a civil lawsuit, the burden is on the plaintiff to prove the negligence of the defendant by a preponderance of the evidence. Miller v. Leonard, 588 So.2d 79 (La.1991); Stone v. Bullard, 43,996 (La.1/28/09), 2 So.3d 1241; Hughes v. Scottsdale Ins. Co., 35,043 (La.App.2d Cir.8/22/01), 793 So.2d 537. Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) whether the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) whether the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element). Hanks v. Entergy Corp., 2006-477 (La.12/18/06), 944 So.2d 564; Lemann v. Essen Lane Daiquiris, Inc., 2005-1095 (La.3/10/06), 923 So.2d 627; Stone v. Bullard, supra.
It is well settled that a court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless such finding is | ¡/‘clearly wrong.” Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Stobart v. State, Dept. Of Transp. & Dev., 617 So.2d 880 (La.1993); Crownover v. City of Shreveport, 43, 521 (La.App.2d Cir. 9/17/08), 996 So.2d 315. If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Neloms v. Empire Fire & Marine Ins. Co., 37,786 (La.App.2d Cir.10/16/03), 859 So.2d 225. In fact, where two permissible views of evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.
In the instant case, Dr. Miles Hitchcock, a former member of the CPSB, was accepted by the court as an expert in “policies, procedures and [the] working of Cad- *695 do Parish School Board and the Caddo Parish School System.” Dr. Hitchcock testified that the CPSB had a duty to ensure that the board’s policies were applied correctly. Dr. Hitchcock also testified that the CPSB was required to perform its duty in a manner which promotes “safety, well-being and the best interests of the students.” He also stated that the framework of the CPSB policy contemplates a “full and complete investigation” by each body during the process (ie., the school, the expulsion hearing officer, the preliminary appeals committee and the CPSB). Dr. Hitchcock stated:
| ¡¡The policy was written with the belief that it was — that expulsion was a last remedy of a student that presented danger to the other students in the school or the orderly conduct of the school and would inhibit the educational processes in schoolf.]
[Pjolicies were written to protect the students and to try to minimize the damage to a student particularly if that student [was] innocent.
Dr. Hitchcock further testified that the expulsion hearing process, as well as the preliminary appeals process, was designed to be “nonadversarial.” He unequivocally opined that the CPSB breached its duty to conduct a “full and complete investigation” at each level of the process in this matter. Dr. Hitchcock also opined that the investigation should have ended when Andrew Heacock came forward and admitted that he had placed the bottle of whiskey in Justin’s backpack without Justin’s knowledge.
Furthermore, Dr. Hitchcock testified that Justin did not get a fair hearing “at any level” in this case. He stated that Hite failed to conduct a thorough investigation into the incident. Dr. Hitchcock also noted that Heacock had informed Hite that he wanted to testify at the hearing, but Hite failed to call him to testify. Dr. Hitchcock stated that Justin and his parents did not understand that they had the right to call witnesses and, unfortunately, relied upon their belief that the school would call Heacock to testify on Justin’s behalf.
Dr. Hitchcock also testified with regard to the discretion of school officials and the CPSB in similar incidents. Specifically, he described an 110incident that took place when he was a member of the CPSB. He stated that a student came to school with a shotgun in his truck. A resource officer saw the weapon in the truck while patrolling the parking lot. An investigation revealed that the student had gone hunting over the weekend and had left the weapon in the truck. The student was expelled from school. However, following a hearing, the CPSB overturned the student’s expulsion, finding that the student did not intend to possess the weapon on campus and had forgotten the weapon was there. Dr. Hitchcock stated that the board evaluated the “totality of the circumstances” and focused on “intent and danger to other students.” He stated, “It was not the intention of the policy for a student to be punished as severely in that particular circumstance and they overturned it.” Dr. Hitchcock testified that the CPSB had the same discretion in the instant ease, but refused to exercise it.
During cross-examination, Dr. Hitchcock testified:
It’s my opinion that at every step of the process that the school board had an obligation to get to the facts. And that there was indeed a tip of the iceberg. You have a student leader in the school telling you this is not how it happened, *696 you’re punishing the wrong person, and I can’t find anywhere where the administration of that school, the hearing officer, or anybody did anything to get facts to either support that or to contradict. The evidence as I see it supports the fact that it was disregarded at best.
Andrew Heacock also testified at the trial. He stated that he learned that Justin “had been caught with alcohol” approximately one hour after the incident. Heacock testified that as soon as his class ended, he “went straight down to the assistant principal’s office to tell him, you know, kind of my side of the story[.]” He also stated that he went to Hite’s office voluntarily 1 nand that he did so because he “felt like I knew that I had put the alcohol in Justin’s backpack and I felt responsible for him being in trouble.” Heac-ock testified that he told both Hite and Cpl. Jackson that he had placed the bottle of whiskey in Justin’s backpack. Heacock unequivocally testified that he never told Hite or anyone else that he had placed the bottle of whiskey on the seat of Justin’s truck. He also testified that he told Dr. McCalla the same story — that he had placed the bottle in Justin’s backpack without Justin’s knowledge. Heacock stated that he testified at the hearing before the CPSB at Justin’s request, but he felt that the superintendent and the board already “had a pretty good idea of kind of which way it was going to go.”
Larry Anderson also testified during the trial. Anderson stated that the hearing process includes giving the school the opportunity to present its case, allowing the student to “tell his side of the story” and giving the student’s parents an opportunity to state their position. He stated that at the conclusion of a hearing, he asks the school for a recommendation before he makes a recommendation on behalf of the superintendent’s office. Anderson testified that the CPSB policy provides that a student who possesses alcohol on campus may either be suspended or expelled. He stated that Hite was supposed to have conducted an investigation prior to levying a suspension and the school should have “look[ed] at the circumstances surrounding the possession of alcohol on campus.” Anderson also testified, “[I]f a student is found to be in possession of the alcoholic beverages on the school campus and the hearing is called[,] I will h ¿remove a student from school. I will expel that student from school.” That comment led to the following colloquy between the trial court and Anderson:
Q: Although you don’t have to remove him, you could simply suspend him?
A: No, sir, that’s not our policy.
Q: Well, you just told me that you could either suspend them or you could expel them and so it appears to me that you have some discretion?
A: No, sir.
Q: [A]re you of the opinion that every time that you have an alcohol case that you are going to expel that child?
A: I’m going to remove them, yes, sir. Q: Regardless of the circumstances?
A: If they prove he had it, yes, sir, I’m going to remove that child.
Q: All right. There’s no way you can think of that you’re not going to expel that child?
A: No, sir. No way that I can think of. Q: All right. Are you required to do that under the policy?
A: Yes, sir.
Q: It doesn’t say anything in here about you have to expel the child. It says, you’re going to have a hearing and *697 hopefully exercise some discretion and hopefully make an intelligent decision. Maybe I’m reading a lot into it. But I’m asking you to point out where it says after a student is suspended ... you have to expel them.
A: I can’t do that, Your Honor[.] All I can share with you reasonably, Your Honor, is that for any part of the disciplinary policy that a student has been suspended that | iSstudent may, at some point in time, be exposed to having to attend an expulsion hearing. And at the hearing the infraction that was violated may lend itself to an expulsion not only for alcohol but for maybe some other violation as well.
Q: And see, that’s what I’m getting at. It may lend itself to an expulsion but “may” indicates it may not. And I’m just trying to say, how do you decide if this is a “may” case or a “may not” case? That’s all I’m asking.
A: Your Honor, I’m at a loss for words.
When asked why he did not obtain a statement from Heacock during the hearing, Anderson stated that he did not believe that Heacock’s statement would have been beneficial and stated, “[I] still would have done what I did, Your Honor, based on the fact that Justin was in possession of alcohol on the premises.” Anderson testified that it did not matter whether Justin knew that the bottle of whiskey was in his backpack; once the school established that the bottle fell from Justin’s backpack, it did not matter where the bottle came from or what explanation Justin provided.
On cross-examination, Anderson admitted that he did not conduct an independent investigation and that his decision to uphold the expulsion was based solely upon information provided to him by Hite. Rather than obtaining a statement from Heac-ock, he relied upon Hite’s assertion that Heacock had stated that he had placed the bottle of whiskey on the seat of Justin’s truck. Anderson testified:
What the school present[ed] to me was what I based mine on and that was that [Heacock] initially said to Mr. Hite that he put the bottle on the seat. He did not say that he put the bottle in the bag. My understanding from the school’s presentation was that after — at a later period in time [Heacock] and Justin spoke and after that | ^conversation [Heacock’s] statement changed to say he put it in the bag.
Anderson testified that he did not obtain a statement from Heacock “because I thought all the information I had was sufficient[.]” He admitted that a statement from Heacock “may have” resulted in a different decision. Anderson also admitted that he would have allowed Heacock to testify at the hearing had he known that Hite had provided misleading information.
Marvin Hite also testified at the trial. Hite testified that he obtained written statements from the students who saw the bottle fall out of Justin’s backpack, but he did not obtain a written statement from Heacock. Hite further testified that Heac-ock asked to testify at the expulsion hearing, but he did not allow him to do so because “we don’t normally get students out of class” and that “likely we wouldn’t need him.” On cross-examination, Hite admitted that he withheld information from Anderson and the preliminary appeals committee. He testified as follows:
Q: So the bottom line is that Justin Christy never got a fair hearing in front of you, in front of Mr. Anderson, in front of Mrs. Atkins, or in front of the school board? Isn’t that true?
A: I would say not in my office and I cannot speak for the others.
*698 Q: You were there. You gave the school’s side of things and you didn’t tell the whole story, did you?
A: They didn’t request him to come to the school board hearing.
Q: You didn’t tell the whole story before Mr. Anderson’s hearing or at Ms. Atkins’ hearing did you?
A: I told what I knew of the story.
11SQ: So you conveniently told Mr. Anderson was that the one witness that knew where the alcohol came from told you that he put it on the seat of the truck but you withheld from Mr. Anderson that he told you that he put it in the backpack, right?
A: Yes, sir.
Q: Do you think that’s fair to a child?
A: No, sir.
Q: This was an inappropriate and an unjust presentation of only a part of the evidence that you had and you knew about at the time of this expulsion hearing, right?
A: Yes, sir.
Q: Now, you got a chance to rectify this because there was another hearing, one before Mrs. Atkins, right, that you testified in again, right?
A: Yes, sir.
Q: So are you tell[ing] us — are you admitting that you didn’t even tell the committee about Andrew Heacock coming to see you not once but twice according to your testimony today?
A: It wasn’t recorded in the school’s response statement but it was mentioned at that hearing.
Q: [W]hy did you tell them part of the truth and not the whole story?
A: I didn’t have a specific reason for doing so. I mean because going through a hearing process and I made some mistakes in it I guess. I mean, I didn’t have a vendetta against Justin, sir. I didn’t even know Justin, you know, so I didn’t have a personal vendetta against him or anything along those lines. I made a mistake in some of the proceedings.
Court: [Yjou’ve got the president of the student council, who is also president of the Key Club, who comes to you and tells you that he’s the one that put the bottle in the backpack and you don’t think that’s important enough to tell Mr. Anderson or to tell Mrs. Atkins and the rest of |ifithese folks that are judging whether this young man is going to be kicked out of school — expelled from school?
A: At the time I didn’t think it was important enough.
Diane Watkins Atkins, the director of the CPSB’s attendance and census department, testified that she served as the chairperson of the preliminary appeals committee that heard Justin’s case. Atkins testified that the purpose of the appeals committee is to conduct “a re-examination” of the expulsion hearing “to see if any steps were missed[.]” At the conclusion of the preliminary appeals process, the committee may either uphold the student’s expulsion, modify it or rescind it. Atkins testified that Hite reported to the committee that Heacock had testified that he placed the bottle of alcohol on the seat *699 of Justin’s truck. Hite never told them about Heacock’s statement that he had placed the bottle in the backpack without Justin’s knowledge. Atkins was clearly troubled by Hite’s misrepresentations to the hearing officer and to the appeals committee. She stated, “We trusted Mr. Hite to give us the report because he was the assistant principal of discipline who authorized [the] arrest based on Justin being in possession of alcohol. That’s how it works.” Atkins testified that according to the CPSB’s policy, a student is “guilty” of possession of contraband, even if someone else placed the contraband in their possession without their knowledge. However, she stated that the CPSB would “absolutely not” punish a student if an investigation revealed that someone else placed the contraband in the student’s possession without his or her knowledge. Atkins unequivocally testified that the CPSB and school | ^officials violated Justin’s right by: (1) Hite’s failure to inform Anderson of Heac-ock’s statement that he (Heacock) had placed the bottle of whiskey in Justin’s backpack without Justin’s knowledge; (2) Hite’s failure to inform the preliminary appeals committee about Heaeock’s statement; (3) Hite’s failure to inform the preliminary appeals committee that Heacock had informed Officer Jackson that he (Heacock) had placed the bottle in Justin’s backpack; (4) Hite’s decision to ignore Andrew’s request to testify at the expulsion hearing. Atkins further testified that it was the school’s responsibility to have Heacock testify at the expulsion hearing. She stated:
At the preliminary hearing, the persons representing the school bring all information — they should be providing us with all information that they are using or have gathered in their investigation to support their decision to suspend and recommend a student for expulsion. Andrew Heacock should have been given the opportunity to come forth on Justin’s behalf at the school level and at the preliminary appeal. Now, whether he would have come with the Christys, he could have, Mr. Hite, he could have. He could have been made available.
It was the school’s responsibility to show all information whether it exonerates or if it shows that Justin was ... in violation of the school board policy.
Atkins opined that Justin would not have been expelled if Hite had provided all of the available information to the committee.
After hearing all of the testimony and reviewing all of the evidence, the trial court stated:
[T]he student was treated in an unbelievably unfair manner through this process with the school board-from the beginning up through the process with the school board. I can certainly understand the things that went on initially that morning when the bottle fell out of his backpack. But in some short order there was sufficient evidence to stop the prosecution against| 1S[Justin].
There is a glaring contrast in the testimony of [assistant principal] Mr. Hite and the testimony of Mr. Heacock. This Court has absolutely no problem stating unequivocally that it accepts the testimony of Mr. Heacock as far more credible than the testimony of Mr. Hite. Mr. Hite, the Court believes, commenced a series of actions that effectively concealed the true subject of his conversation early on with Mr. Heacock. The record was allowed to proceed with Mr. Hite’s representation that Mr. Heacock changed his story. I believe Mr. Heac-ock; I do not believe Mr. Hite. I think anybody listening would come to the *700 same conclusion if they had the opportunity to listen to both of them testify.
And to listen to Mr. Anderson was unnerving because Mr. Anderson did nothing but determine that the whiskey bottle had broken — had fallen out of the backpack and broken. He exercised no discretion and there’s no requirement of a particular punishment, discretion is presumed. There’s no requirement that a student be expelled. He had the discretion to — if he were going to accept that [Justin] was responsible, he had the discretion to assign a lesser punishment, but he denied that he had the ability to exercise that discretion.
Mrs. Atkins — the Court actually felt sorry for her. I thing she was genuinely upset when she realized what happened to this student. She seem very, very upset, somewhat — very sad about what happened to him and acknowledged that this child was not treated appropriately or fairly. I think the actions by Mr. Hite more likely than not were intentional and the actions by Mr. Anderson were at least grossly negligent. I have no problem at all finding liability.
I think each step of the way, frankly, the student and his parents were trusting that they were going to get some sort of fairness and it just never happened.... [Justin] never got the hearing that he was supposed to have. And that in large part is because Mr. Hite never accurately told the truth about what Andrew told him.
At the preliminary appeal stage Mrs. Atkins also agreed that the child had not been treated fairly, the school had failed in its responsibility to present all the evidence and |19that had she known about it the result would have been different.
After reviewing the record in its entirety, we find no manifest error in the trial court’s ruling. It is apparent from the testimony that Hite’s blatant misrepresentation of the truth was a cause-in-fact of Justin’s expulsion from Captain Shreve. The entire process was tainted by Hite’s misrepresentations to Dr. McCalla, the hearing officer and the preliminary appeals committee. Hite admitted that he did not treat Justin fairly and his actions were “inappropriate and unjust.” Hite was unable to explain his actions, stating, “I didn’t have a specific reason for doing so.... I didn’t have a personal vendetta against Justin[.]”
Anderson admitted that he did not conduct any type of investigation into the matter. He testified that he simply relied upon Hite’s representations and “it really didn’t matter what the heck [Justin] said.” Anderson also admitted that he would have expelled Justin regardless of the circumstances because expulsion is “what we normally do.”
Atkins testified that decisions of the preliminary appeals committee and the CPSB were based upon information provided to them by Hite. Atkins provided uncontro-verted testimony that Justin would not have been expelled if Hite had provided all of the available information to the committee.
Although Justin was superficially afforded procedural due process, the entire out *701 come of the proceedings was based upon a faulty premise — Hite’s misrepresentations to the committee. Hite admitted that Justin did Unnot receive fairness during the school’s “investigation” into the incident. The hearing officer, preliminary appeals committee and the CPSB made virtually no effort to ascertain the truth or to enact a punishment that was proportionate to the offense. Despite compelling evidence that the bottle of whiskey was placed into Justin’s backpack by someone else and that Justin was unaware that the bottle was in his backpack, Anderson maintained his belief that he had no discretion in this matter. The trial court’s findings were amply supported by the record. Accordingly, we find no manifest error in the trial court’s ruling that plaintiff met his burden of proving that the CPSB and its officials breached its duty to conduct an investigation into the matter and to exercise its discretion in implementing a punishment. The breach of that duty resulted in Justin being wrongfully expelled from school during his senior year of high school.

Damages

The CPSB contends the trial court abused its discretion in awarding damages in the amount of $50,000. The CPSB argues that Justin was “embarrassed, angry and hurt” by his expulsion from Captain Shreve, but there is no evidence that he sought any medical or psychological treatment; therefore, the CPSB argues that the highest reasonable amount that should have been awarded was $5,000.
Contrarily, plaintiff contends the trial court did not abuse its discretion in awarding $50,000. Plaintiff argues that the fact that Justin “persevered and overcame adversity ... should not become the basis for concluding that he did not suffer ‘damage’ at the hands of school board | ¾1 supervisors.”
In the assessment of damages for personal injury, much discretion must be left to the judge or jury. LSA-C.C. art. 2324.1. General damages involve mental or physical pain and suffering, inconvenience and loss of intellectual or physical enjoyment that cannot be definitively measured in monetary terms. Day v. Ouachita Parish School Board, 35,831 (La.App.2d Cir.8/8/02), 823 So.2d 1039; Robbins v. State Dept. of Labor, 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991. Before the trial court’s general damage award may be disturbed, the record must clearly show that the factfinder abused its broad discretion in making the award. Poulan v. Hunter, 36,225 (La.App.2d Cir.11/6/02), 830 So.2d 1125; Day, supra.
 The assessment of damages is a determination of fact, one entitled to great deference on review. See v. Entergy Corp., 2010-0065 (La.6/4/10), 35 So.3d 1081; Wainwright v. Fontenot, 2000-0492 (La.10/17/00), 774 So.2d 70. Accordingly, a reviewing court’s role in examining general damages is not to decide what it considers to be an appropriate award, but rather, to review the exercise of discretion by the trier of fact. See v. Entergy Corp., supra; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). If an appellate court finds that the trier of fact clearly abused its discretion, it can only disturb the award to the extént of lowering it (or raising it) to the lowest (or highest) point which is reasonably within the discretion given to that court. See, See v. Entergy Corp., supra; Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1977).
|22In the instant case, prior to rendering an award for damages, the trial court stated:
[T]he student did a remarkable job of mitigating his loss.
*702 I want to be very clear, the purpose of the damage award is not punitive. It’s not to punish the school system for what occurred. It’s to — but it needs to take into account what happened to the student from his perspective in a reasonable way[.] Analogizing it to an accident with significant objective indication of injuries, the Court is going to make a damage award of $50,000. I think he was — when he got into Tech obviously he had some remaining problems but I think he was on his way upward and past this hurdle in his senior year.
And admittedly, that’s not scientific, it’s not precise. It’s not to punish the school board, if we had punitive damages it might be a significantly larger award. But it’s not to punish the school board. It’s to try to make the student whole and I think that’s the best I can tell — the best I can calculate an award that would do that[.]
We have conducted an extensive review of relevant case law, and we note that this case presents a unique set of facts, making it difficult to measure monetary damages with any degree of certainty. Justin testified that he did not graduate from high school. The alternative school to which he was assigned did not offer any of the college preparatory courses that he was enrolled in at Captain Shreve. Justin testified that virtually no instruction was provided at the alternative school and that he spent his days at the alternative school as if he were “in detention.” Rather than remain in that unproductive environment, Justin wisely elected to obtain his GED and continue his education at a local community college. Justin also testified that he did not attend his senior prom and was denied involvement with “senior year activities.” He further stated that his expulsion impacted his | ^relationship with his friends and other students. He stated:
It was hard. For the most part it was hard to, you know, I even had one of my friends call me and ask me to prom and I wasn’t able to do it. I went to graduation ... it was hard, you know, to see the bunch I would have graduated with walk across. For the most part, I just didn’t understand what was going on.
As the CPSB points out, Justin did not suffer any physical damage, and there is no evidence that he sought any psychological treatment as a result of the expulsion. However, it is indisputable that the unique facts of this case are extraordinarily tragic. It is clear from Justin’s testimony that he spent an extended period of time feeling the ill effects of being expelled from his high school. As a result of his expulsion, Justin was not afforded the opportunity to participate in any of the age-old “senior year” events with his classmates, including prom and graduation. Although he mitigated his damages by continuing his education, the record reflects that the way Justin was treated by school officials caused him great emotional distress and inconvenience and substantially impacted his enjoyment of life for at least a year.
In Menard v. Lafayette Ins. Co., 2009-1869 (La.3/16/10), 31 So.3d 996, the plaintiff was injured in an automobile accident. The jury awarded the plaintiff $185,300 for medical expenses; the court of appeal increased that award to $1,510,435.02. The Supreme Court reversed the court of appeal’s judgment and reinstated the jury’s verdict, stating:
We find the record evidence easily supports a reasonable basis for the jury’s award[.] This jury award should not have been amended although the Court of Appeal found a higher award would have been more reasonable. We understand and appreciate the reality that *703 many times we |?4would have judged the ease differently had we been the trier of fact, but this is not our function as a reviewing court. A reviewing court cannot disturb an award because it would have judged the case differently. The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with opposing views. We note it is not hard to prove a reasonable basis for a finding, which makes the manifest error doctrine so very difficult to breach, and this is precisely the function of the manifest error review.
Id. at 1011 (emphasis in original).
We find that the record provides a reasonable factual basis for the court’s award of $50,000 in general damages. Based upon these facts, we cannot conclude that the trial court abused its discretion. The assignment of error lacks merit.
CONCLUSION
For the reasons set forth herein, the trial court’s judgment, finding Dr. Sandra McCalla and the Caddo Parish School Board liable to Justin Christy for damages in the amount of $50,000, is hereby affirmed. Pursuant to LSA-R.S. 13:5112, costs of this appeal are assessed against the defendant, the Caddo Parish School Board.[7]
AFFIRMED.
PER CURIAM.
hWe hereby amend the first sentence of the conclusion of the opinion to read, “For the reasons set forth herein, the trial court’s judgment finding the Caddo Parish School Board hable to Justin Christy for damages in the amount of $50,000 is hereby affirmed.”
AMENDED, AND AFFIRMED AS AMENDED.

. Justin testified that he was placed in handcuffs and transported from the school in Cpl. Jackson’s police car. He was held "in an office” at the police station while Cpl. Jackson "did paperwork” and attempted to contact Justin’s parents.

. Justin testified that he "thought” he recalled reading Heacock’s statement at the hearing. Anderson testified that he did not hear a statement from Heacock during the hearing.

. In a letter dated October 24, 2003, Diane Atkins, director of the CPSB's attendance and census department, stated:
There is no doubt that Justin violated the District Discipline Code when he was found in his possession [sic], having alcohol in his backpack and on school property is in direct violation of the Discipline Policy and State Law.
The actions taken by the assistant principal and the subsequent hearing to determine consequences were appropriate for possession of alcohol. It is noted that a student came forth with knowledge concerning the incident, but it is not presented at the hearing; therefore [Justin's] suspension is modified to December 19, 2003.

.By this time, Justin had been out of school for approximately six weeks. The alternative school did not provide the college preparatory courses Justin had been enrolled in at Captain Shreve. Therefore, rather than remain in the alternative school, Justin elected to obtain his GED. Subsequently, Justin attended Bossier Parish Community College for approximately six months, then transferred to Louisiana Tech University. He has since graduated from Louisiana Tech with a degree in biology with a minor in chemistry. At the time of trial, Justin was enrolled in the physician's assistant program at Louisiana State University Health Sciences Center.

. On May 27, 2004, Justin was substituted as a party plaintiff, as he had reached the age of majority.

. LSA-R.S. 17:416(C)(1) provides:
Upon the recommendation by a principal for the expulsion of any student as authorized by Subsection B hereof, a hearing shall be conducted by the superintendent or by any other person designated so to do by the *694 superintendent to determine the facts of the case and make a finding of whether or not the student is guilty of conduct warranting a recommendation of expulsion. Upon the conclusion of the hearing and upon a finding that the student is guilty of conduct warranting expulsion, the superintendent, or his designee, shall determine whether such student shall be expelled from the school system or if other corrective or disciplinary action shall be taken. At said hearing the principal or teacher concerned may be represented by any person appointed by the superintendent. The concerned teacher shall be permitted to attend such hearing and shall be permitted to present information the teacher believes relevant. Until such hearing takes place the student shall remain suspended from the school. At such hearing the student may be represented by any person of his choice.

. Our records reveal that all costs of this appeal have been paid, and no other costs are due at this time.